1  Mark Holscher (SBN 139582)
2  mark.holscher@kirkland.com
   Michael Shipley (SBN 233674)
3  michael.shipley@kirkland.com
4  David Klein (SBN 273925)
   David.klein@kirkland.com
5  Kirkland & Ellis LLP
   333 South Hope Street, Suite 2900
6  Los Angeles, California  90071
7  Telephone:  (213) 680-8400
   Facsimile:   (213) 680-8500
8

9  Attorneys for Plaintiff Jemella Group Limited

10

11              UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                                      CV13-02562-SH

14  JEMELLA GROUP LIMITED, a United ) No.
15  Kingdom Limited Company,         )
                                     )
16          Plaintiff,               )  **COMPLAINT FOR DECLARATORY**
                                     )  **RELIEF**
17                                   )
       vs.                           )
18                                   )  **JURY TRIAL DEMANDED**
19  KILLER QUEEN, LLC, a California  )
    Limited Liability Company        )
20                                   )
                                     )
21                                   )
          Defendant.                 )
22                                   )

23        COMES NOW the Plaintiff JEMELLA GROUP, LTD, a citizen of the United

24  Kingdom, and for causes of action against the Defendant KILLER QUEEN, LLC,

25  complains and alleges as follows:

26              **NATURE OF THE SUIT**

27        1.    On February 10, 2011, Plaintiff JEMELLA GROUP LIMITED ("JGL")

28  and Defendant KILLER QUEEN, LLC ("KILLER QUEEN") entered into a written

---

1  agreement through which KILLER QUEEN'S sole member Katy Perry would endorse

2  JGL's hair-styling products for two years.  JGL paid KILLER QUEEN all the money

3  due under the agreement—$4.5 million for the two-year endorsement—and complied

4  with its obligations.  The parties never agreed to exercise the option for the third

5  contract year.

6         2.     The February 10, 2011 agreement protected the parties from claims of

7  oral deals that plague the entertainment industry; it expressly required that its terms

8  could not "be changed orally, but only by a writing signed by both parties[.]"

9  Nevertheless, Perry's agent at Creative Artists Agency ("CAA") now claims to have

10  obtained a purported oral agreement between JGL and KILLER QUEEN.  He claims

11  the parties orally amended the original agreement to add two and a half years to its

12  term so that Perry would be entitled to $6.5 million more from JGL.  JGL, however,

13  never orally agreed to those terms.  Moreover, it is undisputable that the parties never

14  entered into the required signed written agreement.

15         3.     CAA and KILLER QUEEN's litigation counsel have, nevertheless, made

16  specific, repeated threats to sue JGL if it does not pay an amount satisfactory to their

17  client.  KILLER QUEEN has unequivocally threatened to sue JGL for breach of oral

18  contract, as well as "defamation, tortious interference with contract, and tortious

19  interference with prospective economic advantage, among other causes of action."

20  There is thus a ripe actual controversy between the parties.  This is an action pursuant

21  to the Declaratory Relief Act, 28 U.S.C. § 2201, for a declaration from this Court that

22  those claims have no basis because JGL owes no contractual or other civil obligations

23  to KILLER QUEEN.

24         **THE PARTIES, JURISDICTION, AND VENUE**

25         4.     JGL is a United Kingdom "limited" company, with its principal place of

26  business in Leeds, England.  Because a U.K. "limited" company is treated as a

27  corporation for diversity of citizenship purposes, JGL is a citizen of the United

28  Kingdom.

1      5.    JGL is in the business of selling high-end hairstyling products such as flat

2  irons, hair dryers, hair brushes, and other hair products through a business it operates

3  under the name ghd—for "good hair day" ("GHD").

4      6.    KILLER QUEEN is a California Limited Liability Company, whose sole

5  member, Katheryn Hudson, aka Katy Perry ("PERRY"), is a citizen of the state of

6  California.  KILLER QUEEN is a so-called "loan out" company which exists to sell

7  PERRY's services.

8      7.    On February 26, 2013, KILLER QUEEN, through PERRY's agents at

9  CAA, wrote to JGL claiming that KILLER QUEEN and JGL had entered an oral

10  contract whereby JGL was to pay KILLER QUEEN $6.5 million for services rendered

11  over the course of two and a half years.  On March 18, 2013, KILLER QUEEN,

12  through its experienced litigation counsel, reiterated its claim that JGL "owes Katy

13  Perry the entire sum of $6.5 million" based on the alleged oral agreement between

14  KILLER QUEEN and JGL.  Indeed, in a March 18, 2013 letter, PERRY's and

15  KILLER QUEEN's litigation counsel alleged that "GHD is in material breach" of the

16  purported oral agreement and wrote:  "If this matter is not resolved to my clients'

17  satisfaction, then GHD will be acting at its own peril."

18      8.    There is thus diversity jurisdiction under 28 U.S.C. § 1332(a) because (1)

19  there is complete diversity of citizenship between the plaintiff JGL and the defendant

20  KILLER QUEEN and (2) KILLER QUEEN claims that JGL owes it $6.5 million for

21  the alleged oral extension of the agreement.

22      9.    Venue in this judicial district is proper because KILLER QUEEN,

23  through PERRY, is a resident of Los Angeles, California.  28 U.S.C. § 1391(a)(1).

24  ## GENERAL ALLEGATIONS

25      10.    Advertising and marketing campaigns are an integral part of JGL's GHD

26  high-end hair care products business.  GHD designates certain funds for advertising

27  and seeks to achieve high value for the money spent on its marketing.

28

COMPLAINT FOR DECLARATORY RELIEF

11.     PERRY is an internationally successful recording artist who has gained widespread commercial success in the last five years with numerous hit songs, such as *California Gurls*, *E.T.*, *Teenage Dream*, *Last Friday Night (T.G.I.F.)*, and *Firework*.

12.     On February 10, 2011, JGL and KILLER QUEEN entered a written contract (the "Agreement"), wherein PERRY agreed to provide services as a celebrity spokesperson for GHD's products.

13.     Under the terms of the Agreement, attached hereto as Exhibit A, JGL purchased the right to use PERRY's endorsement, name, signature, biographical materials, likeness and photograph in its marketing materials.  In addition, JGL obtained the right to sponsor PERRY's Australian, New Zealand, UK, and Ireland tour dates in 2011.

14.     The Agreement contains specific provisions that govern the period of time in which the Agreement remains in effect.  The Agreement provides for an "Initial Term" of two years, running from the "First Use Date"—first date on which GHD issues any publication, public relations release, announcement or exploitation of materials under the Agreement—until the end of the "Second Contract Year," twenty-four months later.  Agreement ¶ 1.

15.     The Agreement also includes an "option exercisable by mutual agreement to extend the Initial Term for one (1) additional year." *Id.*  This "Optional Third Contract Year" must "be exercised no later than six (6) months prior to the end of the Second Contract Year." *Id.*  Because the first press release or announcement of PERRY's endorsement was on March 7, 2011, the Second Contract Year ended on March 6, 2013, and the Optional Third Contract Year would have run from March 7, 2013 through March 6, 2014.

16.     In exchange for the guaranteed sum of $4.5 million, JGL purchased the right to use PERRY's endorsement in its advertising for the Initial Term and its sponsorship of tour dates. *Id.* ¶¶ 2, 3, 4, 5.a.  If the parties agreed to the Optional

1    Third Contract Year, JGL's usage rights would continue for another year in exchange

2    for payment of an additional $3 million to KILLER QUEEN. *Id.* ¶ 5.c.

3         17.    Under the Agreement, PERRY must provide two "Service Days" per

4    year for photography purposes. *Id.* ¶ 2.  If the parties agree to the Optional Third

5    Contract Year, then PERRY would provide two further Service Days. *Id.*  Although

6    KILLER QUEEN has approval rights over any photographs and final ads produced

7    under the Agreement, all approvals must be made in a timely and reasonable manner,

8    and in any event within five days. *Id.* ¶ 10(b).

9         18.    The Agreement expressly provides that the Agreement is "a complete and

10   exclusive statement of the terms . . . and ***may not be changed orally, but only by***

11   ***writing signed by both parties hereto.***" *Id.* ¶ 15 (emphasis added).

12        19.    From May through July of 2012, there were delays in obtaining

13   PERRY's approval of GHD marketing campaign photography and a quote to be

14   included in a GHD press release.  On multiple occasions, JGL's employees sent

15   emails to PERRY's representatives, including her management and her agent at CAA,

16   to reiterate requests for approval and express concerns regarding delay.

17        20.    Due in part to PERRY's delay, JGL wanted to extend its usage rights

18   under the Initial Term for six months.  On August 9, 2012, JGL sent an email to

19   PERRY's agent at CAA proposing that PERRY agree to not only renew the

20   Agreement under the Agreement's Optional Third Contract Year but also extend

21   JGL's usage rights during the Second Contract Year by six months in return for

22   $500,000.

23        21.    On September 6, 2012—the deadline for exercising the option for the

24   Optional Third Contract Year under the Agreement—JGL's Chief Marketing Officer

25   sent Perry's agent an email to confirm that JGL wished to extend the Agreement for

26   one-and-a-half years and proposed details of an optional fourth contract year for

27   which KILLER QUEEN would receive an additional $3 million.  Attached to that

28   September 6, 2012 email was a draft addendum to the Agreement.  This addendum

1   sets forth the proposed six-month extension of usage rights in exchange for $500,000

2   and the parties' agreement to the Optional Third Contract Year, which would

3   commence at the end of the six-month period. The addendum expressly provided that

4   its purpose was "to record the terms of the extension" of the February 10, 2011

5   Agreement. Moreover, the addendum expressly stated that JGL's and KILLER

6   QUEEN's signatures were needed to amend the Agreement. GHD's Chief Marketing

7   Officer requested that PERRY's agent confirm acceptance of the proposal by return.

8        22.    KILLER QUEEN, however, rejected JGL's offer. Instead, PERRY's

9   agent informed JGL that PERRY would only agree to an extension of JGL's usage

10   rights during the second year for $500,000 if JGL committed to paying $3 million for

11   a fourth contract year. PERRY's agent demanded $1 million for the extension of

12   JGL's second year usage rights if JGL would not agree to a fourth contract year.

13        23.    Throughout October 2012, the parties continued negotiating a potential

14   extension of the agreement that would exceed the Optional Third Contract Year and

15   potentially amend some of the other terms of the Agreement. Unlike the earlier

16   negotiations in September, the parties never even exchanged proposed drafts of

17   agreements for signature.

18        24.    During that time, PERRY's agent told JGL's representatives that he was

19   negotiating with another hair care company to get more favorable terms for PERRY to

20   endorse other hair products. PERRY's agent claimed that he was negotiating an

21   equity interest in the other hair care company for PERRY that was purportedly more

22   lucrative than the potential extension of the agreement with JGL. JGL does not know

23   whether such negotiations with another hair care company actually occurred, or if the

24   representations of PERRY's agent were a negotiating tactic. Were PERRY to endorse

25   a competing or related product, however, JGL's advertising campaign featuring

26   PERRY would be seriously compromised.

27

28

COMPLAINT FOR DECLARATORY RELIEF

25.   In an October 10, 2012 telephone call, JGL's Chief Marketing Officer discussed what potential terms KILLER QUEEN would accept to extend the Agreement.

26.   On October 11, 2012, JGL emailed PERRY's agent, proposing terms that would "extend the current deal." Later that day, PERRY's agent responded, saying that he would "read through it and discuss with" PERRY and her manager.

27.   On October 17, 2012, JGL sought confirmation by email regarding whether the terms were "good to do." PERRY's agent responded that they were "still discussing."

28.   On October 22, 2012, PERRY's agent emailed JGL to say that he thought "we are in good shape" but there were still "[a] few minor tweaks." At no point, however, did PERRY's agent accept the terms that had been previously proposed by JGL, in writing or otherwise.

29.   On November 14, 2012, PERRY's agent emailed JGL indicating that he "need[ed] a doc this week" to memorialize any potential agreement. JGL never sent any proposed agreement to PERRY's agent in part because, around the same time, JGL received some initial findings based on marketing research that it had commissioned regarding its advertising campaign. The research revealed that PERRY had a "[s]ignificant decrease in appeal across Europe" and was "[i]ncreasingly polarizing" with an "increase in respondents with negative perceptions in all markets[.]" Some survey participants suggested that PERRY had "cheapened the [GHD] brand."

30.   PERRY's weakness in appeal in Europe was a concern for JGL, as Europe is currently GHD's leading market. Likewise, JGL was concerned that PERRY was purportedly negotiating a contract with another hair care company that might result in PERRY's endorsement of a competitor.

COMPLAINT FOR DECLARATORY RELIEF

31.   JGL was also displeased that Perry's services were limited in breadth—she was neither willing to be photographed holding GHD's products or to actively endorse them using social media.

32.   By mid-November, JGL had decided that it did not want to extend the contract for PERRY's services.

33.   On November 19, 2012, JGL's Chief Marketing Officer called PERRY's agent and informed him that the contract would not be renewed.

34.   Minutes after the call, PERRY's agent emailed the Chief Executive Officer of JGL, stating "[w]e need to talk."

35.   Over the next several months, PERRY's agent repeatedly contacted the JGL CEO and attempted to re-negotiate a new contract.  These negotiations were not fruitful.

36.   On February 19, 2013, JGL's CEO called PERRY's agent and reiterated that JGL would not be extending the contract with KILLER QUEEN.

37.   On February 26, 2013, PERRY's agent wrote JGL a letter claiming that an oral contract had been formed between JGL and KILLER QUEEN in October 2012 and demanding that JGL pay KILLER QUEEN $6.5 million.

38.   On March 6, 2013, the Initial Term ended under the terms of the Agreement.

39.   On March 18, 2013, when JGL's counsel responded that no new contract had been formed, litigation attorneys acting on PERRY's behalf responded and asserted that GHD was in "material breach" of the alleged "oral agreement" and threatened that JGL "will be acting at its own peril" if it did not settle the dispute to the satisfaction of his client, and that KILLER QUEEN would sue JGL if it did not get paid.

40.   On March 27, 2013, JGL offered to mediate the dispute.  KILLER QUEEN's litigation counsel responded that it would only participate in the mediation proposed by JGL, if JGL made an initial offer that was acceptable to KILLER

-8-

1  QUEEN.   Specifically, on April 8, 2013, KILLER QUEEN's litigation counsel

2  advised JGL's counsel that if JGL's pre-mediation offer was not sufficient for his

3  clients, KILLER QUEEN would sue JGL rather than mediate.

4      41.    At this time, litigation between JGL and KILLER QUEEN regarding the

5  existence and validity of the asserted oral agreement is not only likely, it is imminent.

6              **FIRST CAUSE OF ACTION: DECLARATORY RELIEF**

7                        (28 U.S.C. § 2201)

8      42.    Paragraphs 1 to 41 are incorporated by reference herein.

9      43.    There is currently an actual controversy between the parties regarding

10  whether they are parties to a binding and enforceable contract.

11      44.    JGL is entitled to declarations from the Court that:

12          a.      There is no oral contract between JGL and KILLER QUEEN that

13  modified or extended the parties' written February 10, 2011 Agreement;

14          b.      There are no other oral contracts between JGL and KILLER

15  QUEEN;

16          c.      Even if there were an oral contract between JGL and KILLER

17  QUEEN that modified or extended the parties' February 10, 2011 Agreement,

18  that contract is not enforceable under California Civil Code § 1698(c) because

19  the parties previously agreed, in writing, that the February 10, 2011 Agreement

20  could be modified only in a writing signed by the parties, and there is no signed

21  writing;

22          d.      Even if there were an oral contract between JGL and KILLER

23  QUEEN, it is unenforceable under the statute of frauds; and

24          e.      JGL is not liable to KILLER QUEEN for any obligation in

25  contract, quasi-contract, tort or otherwise.

26              **PRAYER FOR RELIEF**

27  JGL prays that the Court order and award the following:

28

-9-
COMPLAINT FOR DECLARATORY RELIEF

1.     The declaratory relief addressed above;

2.     Attorney's fees and costs of suit, as permitted by law, equity, or contract;

3.     Damages, according to proof;

4.     That KILLER QUEEN take nothing; and

5.     Any other relief deemed by the Court to be fair, just, and equitable.

## JURY DEMAND

JGL respectfully demands a trial by jury.

DATED:  April 11, 2013           Respectfully Submitted,

KIRKLAND & ELLIS LLP

By: _____

Mark Holscher

Attorneys for Plaintiff Jemella Group Limited

COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT A

This Agreement is entered into as of February 10, 2011 by Jemella Group Limited for and on behalf of itself and any subsidiaries (collectively, "Buyer") and Killer Queen, LLC ("Lender") for the services of Katy Perry ("Artist") as well as the right to use Artist's endorsement, name, signature, biographical materials, likeness and photograph ("Artist's Image") in connection with the production, publication, distribution and display of advertising, marketing and public relations materials for Buyer's marketing campaign in relation to its products ("Campaign"). The parties hereto agree as follows:

1.     **TERM.** The term of the Agreement shall commence as of the date of execution (the "Effective Date") and continue in full force and effect for two (2) years ("Initial Term") from the first official publication, public relations release or announcement or exploitation of any materials produced hereunder excluding any announcements regarding tour sponsorship, but in any event no later than May 1, 2011 ("First Use Date"); it is understood that Buyer shall provide Lender with written notification of Buyer's first publication of materials. The timeframe commencing with the Effective Date up to and including twelve (12) consecutive months from the First Use Date shall hereinafter be referred to as the "First Contract Year" and the time frame thereafter to the end of the Initial Term shall be referred to as the "Second Contract Year." It is understood that there shall be an option exercisable by mutual agreement to extend the Initial Term for one (1) additional year, which option shall be exercised no later than six (6) months prior to the end of the Second Contract Year; if applicable, the third year shall be referred to as the "Optional Third Contract Year". Hereafter the term of this Agreement comprising of the Initial Term and Optional Third Contract Year (if any) shall be referred to as the "Term".

2.     **SERVICES.**

   (a)     During the Initial Term, Lender will ensure that Buyer shall have the right to utilize Artist's services for two (2) Services Days (as defined below) per year for photography production purposes, for a total of four (4) Service Days and if applicable, two (2) further Service Days during the Optional Third Contract Year.

      (i)     A Service Day shall be defined as up to ten (10) consecutive hours from call time to release, inclusive of wardrobe, hair, makeup, other reasonable meal and customary breaks.

      (ii)     Buyer will submit to Lender for approval treatments relating to the shooting by Buyer of behind-the-scenes still images ("B-Roll Photos") during the Service Days provided that it is limited to two (2) non-consecutive hours, is non-intrusive and is taken after Artist's hair and make-up is ready. Any B-Roll material shall be subject to Lender's final edit approval. For avoidance of doubt, there shall be no press on set and Artist shall not participate in any interviews or press activities during the Service Days.

      (iii)     The dates and times of the Service Days shall be mutually agreed upon by the parties; all Service Days shall be rendered in Los Angeles, CA, unless otherwise agreed upon by Lender. It is acknowledged that the first Service Day shall be rendered on February 15, 2011 in Los Angeles, CA and the second Service Day shall be arranged for a date before August 31, 2011.

      (iv)     In the event Buyer requests that Artist travels outside of Los Angeles, CA to render services, Lender shall receive an additional One Hundred Thousand ($100,000) US Dollars per travel day.

   (b)     Lender will ensure that Artist will participate in customary and reasonable wardrobe fittings ("Fitting Days") prior to Services Days, with the exact date, time and location subject to the mutual approval of the parties taking into account Artist's availability. Buyer shall be responsible for hiring and scheduling Lender approved make-up, hair and

wardrobe personnel for such Fitting Days. Lender will ensure that Artist will work with the Buyer during the Fitting Days to agree on the make-up, hairstyle and wardrobe which will be used during the Service Days.

(c)    After the first Service Day, Lender will ensure that Artist shall participate in one (1) interview ("Interview") via telephone, which shall not exceed twenty (20) minutes in length and shall be at a time and date approved by Lender. Lender shall have absolute approval over the publication, content and context of the Interview. Furthermore, Artist shall complete a question and answer session; it is understood that Lender shall have prior approval over all questions and that the answers shall be used for public relations purposes only.

(d)    During the Term, Lender will ensure that a rotating banner is added to Artist's website (www.katyperry.com) which links to Buyer's website (www.ghdhair.com) in the following size: 580 x 90 pixels; it being understood that the time of the rotation shall be the same as all other banners on the website. Lender shall also add a link to Buyer's website on Artist's Facebook favorites page. Except as aforementioned, all other aspects of the link and the banner shall be mutually agreed by the Lender and Buyer.

(e)    Each year of the Term, the Lender will ensure that Artist shall sign up to one hundred (100) Artist-approved poster prints which can then be used by Buyer for approved public relations and internal purposes only.

3.    **TOUR SPONSORSHIP.** Buyer shall pay Lender Five Hundred Thousand ($500,000) US Dollars, payable by April 1 2011, to be a secondary tour sponsor on Artist's Australian, New Zealand, UK and Ireland tour dates between April 28, 2011 and November 8, 2011. In connection with the tour sponsorship, Lender shall provide Buyer with the following assets:

(a)    Signage in lobby areas with the creative and size to be approved. Buyer shall be responsible for all production and associated costs;

(b)    Where permitted by venues, space at venues in lobby areas to be used for styling, demos, distributing leaflets/coupons, showcasing Buyer's products ("Product"). Buyer shall be responsible for all production and associated costs;

(c)    Where permitted by venues, space at venues for a private VIP area to entertain guests. Buyer shall be responsible for all production and associated costs;

(d)    One (100) hundred tickets across UK, Ireland, Australian, New Zealand and US dates to be mutually agreed upon by the parties;

(e)    A limited number of meet & greets in UK, Ireland, Australian, New Zealand and US markets to be mutually agreed upon by the parties;

(f)    Use good faith efforts to have the Products used back stage during Artist's shows;

(g)    Inclusion in any remaining advertising for the Australian, New Zealand, UK and Ireland tour dates between April 28, 2011 and November 8, 2011;

(h)    Access for Buyer's blogger at a limited number of dates; it being understood that blogger may only use approved stills (no video);

Exhibit A
12

(i)     Tour sponsorship exclusivity in Australia, New Zealand, UK and Ireland between April 28, 2011 and November 8, 2011 with respect to the Competitive Products (as defined below).

All other aspects of the tour sponsorship will be negotiated in good faith.

4.      **USAGE.**  During the Term, Buyer shall have the right to use the Artist's Image throughout the World as part of the Campaign as follows:

(a)     in print advertisements and competitions approved by Lender

(b)     in point-of-sale materials in salons and approved premium retailers

(c)     in outdoor and other billboard advertising

(d)     on the Internet (no pop-up advertisements or homepage takeovers) on the Buyer's website, RKCR/Y&R websites and approved third party websites carrying editorial content only. For the avoidance of doubt, there shall be no paid advertising online.

Hereafter (a) – (d) are collectively referred to as the "Marketing Materials".

5.      **COMPENSATION.**  In consideration of the Lender complying with the terms of this Agreement the Buyer agrees to pay Lender the following:

(a)     Initial Term.  The guaranteed sum of Four Million ($4,000,000) US Dollars ("Guaranteed Sum"), on a pay or play basis to be paid as follows:  (i) One Million ($1,000,000) US Dollars upon Lender's execution of the Agreement, but in no event later than February 14, 2011 ("Initial Payment") and (ii) One Million ($1,000,000) US Dollars every six (6) months from the date of Initial Payment.

(b)     Television Option.  Subject to Lender's absolute approval, Buyer shall have the right to request Artist to render one (1) further Service Day for on-camera services and for the right to request the additional usage of the Artist's Image on television.  If Lender authorizes such services and usage, Buyer shall pay Lender an additional One Million ($1,000,000) US Dollars, which shall be allocated as follows: Five Hundred Thousand ($500,000) US Dollars for the further Service Day and Five Hundred Thousand ($500,000) US Dollars for the television usage.  It is understood that in the event of television usage, Buyer warrants and represents that the production entity for the television commercials is a signatory to the Screen Actors Guild and all other applicable unions having jurisdiction thereof and in addition to the compensation, Buyer shall be responsible for paying the applicable pension, health and welfare for Artist directly to the applicable union(s).

(c)     Option Third Contract Year. The sum of Three Million ($3,000,000) US Dollars ("Optional Sum"), which shall be paid upon exercise of the Optional Third Contract Year.

(d)     Payee.  All payments pursuant to this Agreement shall be made to Lender at Creative Artists Agency address set forth below, or to such other address as Artist shall provide, and such payments shall fully satisfy all of Buyer's payment obligations hereunder.

6.      **FORCE MAJUERE.**  If for any reason beyond Buyer's control including, without limitation, force majeure occurrence, strike or labor dispute, or restraint of public authority, Buyer is prevented from utilizing Artist's services on a scheduled Service Day, Buyer shall pay Lender the fee of Two Hundred

and Fifty Thousand ($250,000) US Dollars (hereafter the "Cancellation Fee") per cancelled Service Day; it is understood that the cancelled Service Day shall be rescheduled, at no additional cost to Buyer. Lender and Buyer will agree upon the date of the rescheduled Service Day taking into account the Artist's availability. The Cancellation Fee shall not be payable if Buyer is prevented from utilizing Artist's services on a scheduled Service Day due to any failure by Lender to ensure that the Artist is available to fulfill the services provided for under this Agreement on the scheduled Service Day.

7.   **INDEMNITY.**

       (a)      By Buyer.  Buyer shall indemnify, defend and hold Lender and Artist harmless from and against any and all damages, costs, judgments, penalties and expenses of any kind (including reasonable legal fees and disbursements) which may be obtained against, imposed upon or suffered by Lender and Artist arising out of the creation, distribution or exhibition of any Marketing Materials produced by Buyer hereunder or any product liability actions, including any claims or actions for personal injury or death involving alleged defects in the Products, brought against Lender and/or Artist. Lender and/or Artist shall not settle any claim in respect of which indemnity may be sought under this Agreement, without Buyer's prior written consent, which shall not be unreasonably withheld or delayed.

       (b)      By Lender and Artist.  Lender agrees to indemnify and hold Buyer harmless from and against any and all damages, costs, judgments, penalties and expenses of any kind (including reasonable legal fees and disbursements) which may be obtained against, imposed upon or suffered by Buyer as a result of the material breach by Lender or Artist of any of the terms of this Agreement.

       (c)      Notification.  Each indemnitee shall promptly notify the indemnitor of any claim, suit or proceeding requiring indemnification hereunder.

8.    **EXCLUSIVITY.**  During the Term, Lender warrants and represents that Artist will not render services of any kind or grant same or similar rights as herein including not providing voiceovers in commercials for any Competitive Products (as defined below) or permit the use of Artist's Image in advertising for any Competitive Products (as defined below). Nothing shall preclude Artist from appearing in any form of entertainment, however characterized, news or information portion of any motion picture, television, radio or other program regardless of the sponsorship thereof or use of Competitive Products therein, or preclude Artist's services in connection with any merchandising and/or product placement in or for any of the above, even for Competitive Products. This extends to, without limitation, movies, Tivo, videogames, internet productions, or any production of any nature whatsoever. For clarification, Lender will ensure that Artist as herself, shall not be a direct endorser of a Competitive Product. "Competitive Products" shall be defined as: straighteners, stylers, shampoos, conditioners, conditioning treatments/masks, thermal protectors, volumiser spray, creation spray, spray for curls, smoothing balm, frizz free cream, styling mousse, polishing serum, shining serum, reflection spray, precision wax, sculpting wax, hairspray, styling brushes, combs and hair dryers.

9.    **INSURANCE.**  Lender and Artist's interest shall be noted on Buyer's comprehensive general liability, errors and omissions and all other customary insurance coverage (including product liability insurance).

10.   **APPROVALS.**

       (a)      Hair, Makeup, Manicurist and Wardrobe Stylists.  Buyer shall choose and Lender shall have complete approval over the hairstylist, make-up artist, manicurist and wardrobe stylist used for each Service Day.

(b)　　Marketing Materials.  Lender shall have complete approval over all still photographs, layouts, retouching, copy, final composed ads for all Marketing Materials. The final edited versions of the Marketing Materials produced hereunder will not deviate from the approved materials, unless approved by Lender in advance and in writing.  It is acknowledged that Artist will only be advertising appliance products (no styling/wet products) and in no event shall Artist be depicted as holding any Product.

(c)　　Photographer/Director.  Lender shall have approval over the photographer and director appointed by the Buyer; it being understood that David LaChapelle has been approved for the first Service Day.

(d)　　Wardrobe.  The wardrobe Artist wears during the Service Days shall be chosen by Buyer with the approval of the Lender.

(e)　　Casting of Talent.  Lender shall have approval over any co-star (inclusive of models) which the Buyer wishes to feature prominently with Artist in the Campaign.

(f)　　Approvals.  Any and all approvals under the terms of this Agreement will be made in a timely and reasonable manner, but in any case (unless otherwise set forth herein) within five (5) business days of Buyer communicating the request to Lender.  Failure to provide a timely approval, or to disapprove with a detailed and reasonable explanation setting forth the reason for disapproval, will constitute the request being deemed to be approved.

## 11.　　LENDER'S OBLIGATIONS.

(a)　　Lender will ensure that the services Artist provides under this Agreement are provided to the best of the Artist's skill and ability and will ensure that the Artist arrives promptly for any Service Days and interviews and abides by the rules of the studio or location.

(b)　　It is a condition of this Agreement that Lender has the free and unrestricted right to enter into the Agreement and that Artist performs the duties and services contained within this Agreement.

(c)　　Lender warrants that Artist will not at any time during this Agreement make any statement, orally or in writing, publicly or privately, or do any act or otherwise conduct herself in such a manner which disparages Buyer or the Products, or adversely affects any marketing campaign in relation to Buyer and/or the Products whether as a result of Buyer's association with the Artist or otherwise.

(d)　　Lender warrants that as at the date hereof the Artist has no pre-existing mental or physical conditions, which would affect her ability to perform the obligations as detailed in this Agreement.

(e)　　During the Term, Buyer and RKCR/Y&R will have the right to include material from the Campaign on their show reels, on their websites and in presentations at company conferences and any company annual general meetings of shareholders.  Buyer and RKCR/Y&R will also have the right to display any approved material from the Campaign within their offices and will have the right to enter any material from the Campaign into industry awards and to use approved screen grabs or approved stills taken from the Campaign for approved editorial public relations purposes.

## 12.　　TERMINATION.

(a)　　Without prejudice to any rights that have accrued under this Agreement or any of its rights or remedies either party may terminate this Agreement with immediate effect by giving written

notice to the other party if the other party commits a material breach of any material term of this Agreement and (if such breach is remediable) fails to remedy that breach within a period of ten (10) business days after being notified in writing to do so; or

(b)     Buyer may terminate this Agreement with immediate effect by giving written notice to Lender if during the Term: (i) Artist is convicted of a felony, (ii) Artist commits any act that brings her into public disrepute, contempt, scandal or ridicule or (iii) Artist dies or, by reason of illness or incapacity (whether mental or physical), the Lender is unable to procure the services of the Artist as envisaged under the terms of this Agreement.

13.     **CONFIDENTIALITY.**

Each party acknowledges that, during the Term, it may have access to certain confidential and proprietary information of the other party. Neither party, nor their directors, officers, employees or agents, will publicize, disclose or use (except as provided in this Agreement) any such confidential or proprietary information that is the property of the other party, that is designated as confidential or by its nature is clearly confidential and that is disclosed to that party pursuant to this Agreement. It is agreed that neither party will be under any obligation not to disclose any information that: (i) was already known to the recipient at the time of its receipt; (ii) was publicly known or becomes so through no fault of the disclosing party; or (iii) is required to be disclosed by law. Each party will be privileged to make disclosure to attorneys, agents and accountants of each party on a need to know basis. The obligations set forth in this paragraph will survive the termination of the Agreement, and upon such termination, each party will return to the other all confidential materials belonging to the other party that were delivered during the Term.

14.     **GENERAL PROVISIONS.**

(a)     Notices.  Any notice to be given by Buyer or Lender hereunder will be deemed sufficiently given if in writing and delivered personally or sent by certified mail, facsimile or email. Any notice so delivered, mailed, faxed or emailed will be deemed to be given on the date it is delivered personally, received by certified mail or sent by email or facsimile. Any notice or other communication required to be given under this Agreement shall be sent to each party required to receive the notice or communication as set out below:

Lender:      c/o Creative Artists Agency
             2000 Avenue of the Stars
             Los Angeles, CA 90067
             Attn: Christian Carino
             Email: ccarino@caa.com
             Fax: (424) 288-3648

Buyer:       Mike Cohen
             Chief Marketing Officer
             Bridgewater Place, Water Lane, Leeds LS11 5BZ, England
             Email: m.cohen@ghdhair.com
                cc: a.mewes@ghdhair.com
             Fax:   +44(0) 1132615603

(b)     Headings.  The headings in this Agreement are inserted solely for purposes of facilitating easy reference and shall not be construed in any way as a part of the text, or as altering the substantive provisions of this Agreement.

(c)     Applicable Law. This Agreement shall be governed and construed in accordance with the laws of the State of California and the exclusive jurisdiction of the Courts of California.

(d)     Severability. If any provision of this Agreement is determined to be invalid by a court of competent jurisdiction, such determination shall in no way affect the validity or enforceability of any other provision herein.

(e)     Entire agreement. This Agreement represents the entire understanding between the parties regarding its subject matter and supersedes any prior agreement, understanding or arrangement between the parties whether oral or in writing.

(f)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one agreement binding on all parties, notwithstanding that all parties are not signatories to the original or the same counterpart.

15.     **COMPLETE AGREEMENT.** This document is a complete and exclusive statement of the terms of this Agreement and may not be changed orally, but only by writing signed by both parties hereto.

ACCEPTED AND AGREED:

JEMELLA GROUP LIMITED                          KILLER QUEEN LLC

By: _____                    By: _____
Its:   MARK HALL                                Its:
       CHIEF FINANCIAL OFFICER
Dated: 10TH FEBRUARY 2011                       Dated:

Exhibit A

17

In consideration of Jemella Group Limited and its subsidiaries ("Buyer") entering into the above agreement with Killer Queen LLC ("Lender") dated February 10, 2011 ("Agreement"); I, Katy Perry, acknowledge that I have read the Agreement and I:

1.  agree to use my best endeavours to procure that all Lender's obligations under the Agreement are complied with punctually in accordance with the terms of the Agreement;

2.  guarantee to Buyer the due and punctual performance of the Lender's obligations and liabilities under or in connection with the Agreement (the "Guaranteed Obligations") if and when they become performable in accordance with the terms of the Agreement.

3.  as principal obligor and as a separate and independent obligation and liability agree to indemnify and keep indemnified the Buyer in full and on demand from and against all and any losses, costs, claims, liabilities, damages, demands and expenses suffered or incurred by the Buyer arising out of, or in connection with:

    (a)  any failure of the Lender to perform or discharge any of its obligations or liabilities in respect of the Guaranteed Obligations;

    (b)  any of the Guaranteed Obligations being or becoming totally or partially unenforceable by reason of illegality, incapacity, lack of or exceeding powers, ineffectiveness of execution or any other matter.

4.  warrant that Lender (a) is expressly authorized by me to enter into the Agreement for the provision of Artists services, and (b) holds the right to enter into the Agreement for use of Artist's images as set forth in the Agreement.

By: _____
     Katy Perry

Dated:

Any appeal from a judgment of the magistrate judge shall be taken to the United States Court of Appeals in the same manner as an appeal from any other judgment of the district court in accordance with 28 U.S.C. §636(c)(3).

If a party has not consented to the exercise of jurisdiction by the magistrate judge within the time required by Local Rule 73-2, the case shall be randomly reassigned to a district judge and a magistrate judge shall be randomly assigned to the case as the discovery judge. (Local Rule 73-2.6)

You may contact the Civil Consent Case Coordinator at (213) 894-1871 or consentcoordinator@cacd.uscourts.gov if you have any questions about the Direct Assignment of Civil Cases to Magistrate Judges Program.

## II.   CONTINUING OBLIGATION TO REPORT RELATED CASES

Parties are under the continuing obligation to promptly advise the Court whenever one or more civil actions or proceedings previously commenced and one or more currently filed appear to be related.

Local Rule 83-1.3.3 states: "It shall be the continuing duty of the attorney in any case promptly to bring to the attention of the Court, by filing a Notice of Related Case(s) pursuant to Local Rule 83-1.3, all facts which in the opinion of the attorney or party appear relevant to a determination whether such action and one or more pending actions should, under the criteria and procedures set forth in Local Rule 83-1.3, be heard by the same judge."

Local Rule 83-1.2.1 states: "It is not permissible to dismiss and thereafter refile an action for the purpose of obtaining a different judge."

Local Rule 83-1.2.2 provides: Whenever an action is dismissed by a party or by the Court before judgment and thereafter the same or essentially the same claims, involving the same or essentially the same parties, are alleged in another action, the later-filed action shall be assigned to the judge to whom the first-filed action was assigned. It shall be the duty of every attorney in any such later-filed action to bring those facts to the attention of the Court in the Civil Cover Sheet and by the filing of a Notice of Related Case(s) pursuant to L.R. 83-1.3.

## III.   SERVICE OF PAPERS AND PROCESS

Local Rule 4-2 states: "Except as otherwise provided by order of Court, or when required by the treaties or statutes of the United States, process shall not be presented to a United States Marshal for service." Service of process must be accomplished in accordance with Rule 4 of the Federal Rules of Civil Procedure or in any manner provided by State Law, when applicable. Service upon the United States, an officer or agency thereof, shall be served pursuant to the provisions of FRCP 4(i). Service should be promptly made; unreasonable delay may result in dismissal of the action under Local Rule 41 and Rule 4(m) of the Federal Rules of Civil Procedure. Proof of service or a waiver of service of summons and complaint must be filed with the court.

Name & Address: Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Kirkland & Ellis LLP
333 South Hope Street, Suite 2900
Los Angeles, California 90071
Tel: (213) 680-8400; Fax: (213) 680-8500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEMELLA GROUP LIMITED, a United Kingdom Limited Company | CASE NUMBER |
| PLAINTIFF(S) | **CV 13-02562 —SH** |
| v. | |
| KILLER QUEEN, LLC, a California Limited Liability Company | **SUMMONS** |
| DEFENDANT(S). | |

TO:     DEFENDANT(S):

        A lawsuit has been filed against you.

        Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Mark Holscher_____, whose address is _Kirkland & Ellis LLP, 333 South Hope Street, Suite 2900, Los Angeles, CA 90071_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                                Clerk, U.S. District Court

Dated: _4/11/2013_____          By: _____
                                                **MARILYN**
                                                Deputy Clerk

                                                *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:  Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Kirkland & Ellis LLP
333 South Hope Street, Suite 2900
Los Angeles, California  90071
Tel:  (213) 680-8400; Fax: (213) 680-8500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEMELLA GROUP LIMITED, a United Kingdom Limited Company <br><br> PLAINTIFF(S) <br><br> v. <br><br> KILLER QUEEN, LLC, a California Limited Liability Company <br><br> DEFENDANT(S). | CASE NUMBER <br><br> CV13-02562 —SH <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S):

       A lawsuit has been filed against you.

       Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Mark Holscher_____, whose address is _Kirkland & Ellis LLP, 333 South Hope Street, Suite 2900, Los Angeles, CA 90071____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                                    Clerk, U.S. District Court

       Dated: _4/11/2013_____           By: _Marily Da_____
                                                           Deputy Clerk

                                                        *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ).

JEMELLA GROUP LIMITED, a United Kingdom Limited Company

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

KILLER QUEEN, LLC, a California Limited Liability Company

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Kirkland & Ellis LLP
333 South Hope Street, Suite 2900
Los Angeles, California 90071
Telephone: (213) 680-8400

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Declaratory Relief, 28 USC Sec. 2201;

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/Etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Org.
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Info. Act
- ☐ 896 Arbitration
- ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- ☐ 153 Recovery of Overpayment of Vet. Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accomodations
- ☐ 445 American with Disabilities-Employment
- ☐ 446 American with Disabilities-Other
- ☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus/Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405 (g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: **CV13-02562**

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)          CIVIL COVER SHEET          Page 1 of 2



# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**:  Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐  A.  Arise from the same or closely related transactions, happenings, or events; or

☐  B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐  C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐  D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE**: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | United Kingdom |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
**Note**: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):**  _____   DATE: _____4/11/2013_____

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |